UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

United States of America

v.                                                    **Decision and Order**
                                                            **and**
Duane Loyd,                                    **Report and Recommendation**

                              Defendant.                    16-CR-13A

———————————————————————

## I.     INTRODUCTION

Defendant Duane Loyd ("Duane") and his son Brandon Loyd ("Brandon") stand accused of

committing a bank robbery on December 7, 2015.  Brandon entered a guilty plea on May 25, 2017

and awaits sentencing as of this writing.  Duane filed omnibus pretrial motions on November 17,

2016 and March 1, 2017.  (Dkt. Nos. 35, 40.)  Duane also filed a suppression motion on September

28, 2017 and a jurisdictional motion on September 29, 2017.  (Dkt. Nos. 78, 79.)  In the suppression

motion, Duane seeks to prevent the Government from introducing at trial statements that he made

over the course of three proffer sessions on March 8, 2016; April 27, 2016; and May 3, 2017.  The

Government believes that it is entitled to use Duane's proffer statements at trial because he was not

fully truthful during the proffer sessions, in violation of a proffer agreement that Duane signed.

District Judge Richard J. Arcara has referred this case to this Court under 28 U.S.C. § 636(b).

(Dkt. No. 15.)  The Court held oral argument on June 6 and October 23, 2017 and a suppression

hearing on March 1 and April 18, 2018.  The Court adjudicates the non-dispositive pretrial motions

as described below.  The Court also recommends denying the suppression and jurisdictional

motions.

## II.    BACKGROUND

This case concerns allegations of a bank robbery that Duane and Brandon committed on

December 7, 2015.  The pre-indictment complaint (Dkt. No. 1) contains a factual summary of what

the Government believes that Duane and Brandon did:

> On December 7, 2015, at approximately 11:40 a.m., Brandon Loyd walked
> into the Key Bank located at 4248 Delaware Avenue, Tonawanda, New York, put a
> painter's respirator mask over his face, approached the tellers, and demanded money.
> As he was demanding money, he displayed a firearm and issued orders causing the
> customers in the bank to raise raised their hands into the air.  As Brandon Loyd was
> issuing commands, a customer came through the door, unaware that the bank was
> being robbed.  As the customer entered the door Brandon Loyd immediately pointed
> to the customer and issued a command.  When Brandon Loyd turned back to the
> teller station, the customer who had just entered the bank quickly exited the bank.
> Upon seeing the customer fleeing, Brandon Loyd, with firearm in hand, followed the
> customer out the door.  Brandon Loyd then returned to the teller counter where he
> collected the money provided to him by two tellers in the amount of $9,711.31 in
> United States currency.  Brandon Loyd then departed the bank and entered a blue
> Chrysler 200, NY registration HAR9466, which was a rental vehicle driven by his
> father, Duane Loyd.
>
> Both Duane Loyd (driver) and Brandon Loyd departed the area in the
> aforementioned blue Chrysler 200.  As the blue Chrysler 200 began to leave the area,
> City of Tonawanda Police identified the escaping robbers and vehicle and attempted
> to pull the vehicle over.  A police chase ensued, which resulted in the blue Chrysler
> 200 and a City of Tonawanda Police cruiser colliding.  Both Duane Loyd and
> Brandon Loyd escaped out the driver's side door and began to flee on foot, but were
> captured shortly thereafter.  Police subsequently recovered a disassembled pistol with
> a magazine containing 12 rounds of ammunition in the vicinity of the area where
> Brandon Loyd had run during the pursuit.

(Dkt. No. 1 at 3–4.)  The initial appearance occurred on December 8, 2015, and the detention

hearing occurred on December 10–11, 2015.  (Dkt. Nos. 2, 6, 7.)  Duane and Brandon waived their

rights to a preliminary hearing on January 5, 2016.  (Dkt. No. 10.)

The Government filed an indictment against Duane and Brandon on February 2, 2016.

(Dkt. No. 14.)  The indictment contains five counts plus a forfeiture notice.  With respect to Duane,

in Count 1, the Government accuses Duane of bank robbery in the amount of $10,599 for the

robbery of the Key Bank on December 7, 2015; in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2. In Count 2, the Government accuses Duane of entering a bank with intent to commit a larceny, in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2. In Count 3, the Government accuses Duane of bank larceny in violation of 18 U.S.C. §§ 2113(b), 2113(d), and 2. In Count 4, the Government accuses Duane of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. In Count 5, the Government accuses Duane of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2. The Court arraigned Duane on February 10, 2016. (Dkt. No. 16.)

Duane currently has several motions pending. The Court will address background for each motion as needed below.

## III. DISCUSSION

### A. *Omnibus discovery motions (Dkt. Nos. 35, 40) (non-dispositive)*

#### i. *Rule 16 materials*

Duane seeks Federal Rules of Criminal Procedure ("FRCP") Rule 16 discovery including statements, search warrants, reports, criminal records, and expert summaries. The Government has responded broadly that it has furnished all discovery requested so far and is aware of its obligation to provide continuing discovery as needed. (Dkt. No. 41 at 2.) The Government also has suggested that it is not certain yet whether it will call expert witnesses at trial but that it will furnish expert witness information if it decides to use experts. (*Id.*)

To the extent that any specific requests remain outstanding, the Government is directed either to furnish the information or to provide notice of an objection to production. Otherwise, the Government appears to have fulfilled its obligations at this time, and the Court denies Duane's motion without prejudice as moot.

ii.    *Brady / Jencks / Giglio materials*

Duane seeks information subject to disclosure under *Brady v. Maryland*, 373 U.S. 83 (1963),

the Jencks Act, 18 U.S.C. § 3500, and *Giglio v. U.S.*, 405 U.S. 150 (1972).  "[S]uppression by the

prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution . . . . Society wins not only when the guilty are convicted but when criminal trials are

fair; our system of the administration of justice suffers when any accused is treated unfairly."  *Brady*,

373 U.S. at 87.  The *Brady* rule covers situations "[w]hen the reliability of a given witness may well be

determinative of guilt or innocence."  *Giglio*, 405 U.S. at 154 (internal quotation marks and citation

omitted); *accord U.S. v. Bagley*, 473 U.S. 667, 676 (1985) (plurality opinion) ("Impeachment evidence,

however, as well as exculpatory evidence, falls within the *Brady* rule.") (citing *Giglio*).  When

considering information that might fall under the *Brady* rule, "[t]he question is not whether the

defendant would more likely than not have received a different verdict with the evidence, but

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of

confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  The Government does not necessarily have

to await a defense request to produce information that falls under the *Brady* rule, but neither does it

need to adopt an "open file policy."  *See id.* at 437; *see also U.S. v. Payne*, 63 F.3d 1200, 1208 (2d Cir.

1995) ("Under *Brady* and its progeny, the government has an affirmative duty to disclose favorable

evidence known to it, even if no specific disclosure request is made by the defense.  The individual

prosecutor is presumed to have knowledge of all information gathered in connection with the

government's investigation.") (citations omitted).  Also, "[e]vidence is not 'suppressed' if the

defendant either knew, or should have known, of the essential facts permitting him to take

advantage of any exculpatory evidence."  *U.S. v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations

4

omitted). As for the timing of *Brady* disclosure, "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made. Thus disclosure prior to trial is not mandated. Indeed, *Brady* requires disclosure of information that the prosecution acquires during the trial itself, or even afterward . . . . At the same time, however, the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use." *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (citations omitted).

Here, the Government has acknowledged its affirmative obligations for disclosure under *Brady*, the Jencks Act, and *Giglio*, and has committed to making disclosures within the time that Judge Arcara will set in the eventual trial order. The Government's commitment will suffice, absent a showing that a different arrangement is necessary.

### iii.    FRE 404(b) materials

Duane seeks notice of evidence that the Government would use at trial under Federal Rule of Evidence ("FRE") 404(b). FRE 404(b) governs requests for disclosure of all evidence of prior bad acts that the Government intends to use in its case-in-chief. FRE 404 requires that defendants be given "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to use at trial." To the extent that the Government intends to use any such evidence of a prior bad act in its case in chief, the Government shall produce all FRE 404(b) evidence as directed by Judge Arcara in the trial order.

### iv.    DNA testing

Duane included in his pretrial motions a motion for DNA testing of the firearm allegedly used during the robbery described in the indictment.  Duane wanted the DNA testing because he claims never to have entered the bank in question and wishes to challenge any purported nexus between him and the conduct charged.  (Dkt. No. 40 at 1–2.)  On June 6, 2017, the Court deemed the motion withdrawn without prejudice given the Government's pledge to conduct the testing quickly.  (Dkt. No. 57.)  On July 19, 2017, the parties reported that they resolved the issue of DNA testing as well as nearly every other pending discovery issue.  (Dkt. No. 60.)  With the motion withdrawn and the underlying issue resolved, the Court sees no need to take any further action.

### v.    Bill of particulars

Duane seeks a bill of particulars that specifies, *inter alia*, how he possessed and brandished a firearm; what acts he committed that would be considered violence and intimidation; and what he did to "take" currency; as all of that language is used in the indictment.  (Dkt. No. 40 at 5–6.)  The Government responds that the discovery provided so far, combined with the narrative set forth in the pre-indictment complaint, do more than enough to give Duane notice of how to prepare his defense.  (Dkt. No. 41 at 5–6.)

"Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  *U.S. v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted).  "Moreover, it is of no consequence that the requested information would have required the disclosure of evidence or the theory of the prosecution.  While a bill of particulars is not intended, as such, as a means of learning the

government's evidence and theories, if necessary to give the defendant enough information about the charge to prepare his defense, it will be required even if the effect is disclosure of evidence or of theories. A district court judge, however, has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form." *U.S. v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998) (internal quotation marks and citations omitted). Courts have denied motions for bills of particulars where "the indictment specifies the time, place and nature of the alleged criminal conduct . . . . [and where] the government has produced pursuant to Rule 16 relevant police records from the date of the crime as well as the amended criminal complaint, which further specifies the acts [defendant] is accused of committing." *U.S. v. Remire*, 400 F. Supp. 2d 627, 633 (S.D.N.Y. 2005); *see also U.S. v. Davis*, No. 06 CR 911 (LBS), 2009 WL 1098477, at *4 (S.D.N.Y. Apr. 21, 2009) (denying a bill of particulars where "the Government has already disclosed that it intends to prove at trial that the targets of the robbery were engaged in interstate drug trafficking, including the purchase of marijuana from California for resale to customers in Manhattan and the Bronx").

The Government has the better argument in this instance. As the Court quoted above, the pre-indictment complaint, while not binding on the Government as a bill of particulars would be, made quite clear that Duane was the driver for the robbery alleged in the complaint and the indictment. The Court does not know what the results of the DNA testing were for the firearm, but those results coupled with the narrative in the complaint would make fairly obvious whether the Government intends to pursue a theory of actual or constructive possession of the firearm. When also considering the other pretrial discovery furnished so far, the information available to Duane is enough to avoid the kind of surprise at trial that the Second Circuit has criticized in more complex cases:

In this case the indictment charges a RICO conspiracy of seven years' duration carried out through various extortion offenses. The indictment puts Davidoff on notice that he will be obliged to defend against extortionate schemes directed at one company, AEI, and companies associated with it in contemplation of a merger. At trial Davidoff is then confronted with evidence of extortions aimed at entirely different companies. Though we agree with the Government that even in a RICO case it is not obliged to disclose before trial all of its evidence, we believe the trial judge exceeded his discretion in this RICO prosecution by denying a bill of particulars identifying at least the victims of discrete extortionate schemes that the prosecution intended to prove.

*United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988); *cf. United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) ("However, by the time Chen was called upon to cross-examine the government's witnesses, it was clear not only that the government was alleging several acts of extortion within the relevant time period, but also what those acts were. Indeed, Chen's counsel was given a full opportunity to cross-examine both Teoh and Hsu, and even elicited from Hsu denials that supported the defense's position. In these circumstances, we cannot hold that Chen was unfairly surprised at trial.") (citation omitted). The Court thus denies Duane's motion for a bill of particulars but without prejudice to one issue implied in *Davidoff* and *Chen*. If for any reason the Government attacks Duane at trial with co-conspirators, victims, or transactions that appear nowhere in the complaint, indictment, pretrial discovery, or other trial disclosures then Duane should have the right to seek immediate relief from Judge Arcara.

> ### vi.     *Grand jury materials*

Duane has made a motion for disclosure of grand jury instructions. (Dkt. No. 40 at 6.) Duane does not explain the need for the instructions, except that he wants to review any instructions given "about the requirement that each individual defendant has acted knowingly and willfully in order to be criminally liable for participation in any possession, brandishing, robbery or larceny as alleged in counts 1–5 of the Indictment." (*Id.*) "Parties seeking disclosure have the burden of showing that the requested material is needed to avoid a possible injustice in another

judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed." *In re Grand Jury Subpoena*, 72 F.3d 271, 274 (2d Cir. 1995) (citation omitted). Here, Duane's request for disclosure is too speculative. *See U.S. v. Smith*, 105 F. Supp. 3d 255, 261–62 (W.D.N.Y. 2015). The Court denies the motion accordingly.

### vii.    *Preservation of rough notes*

Duane's pretrial papers include a request to order the Government to preserve rough notes and agency reports "of any interview of any witness interviewed or witness who testified before the Grand Jury." (Dkt. No. 40 at 7.) The Government does not object to the request and asserts that copies of some notes already have been furnished. (Dkt. No. 41 at 8.) To the extent not done so already, the Court directs the Government to arrange for preservation of rough notes pending further instructions from Judge Arcara.

### B.  *Motion to suppress proffer statements (Dkt. No. 78) (dispositive)*

On September 28, 2017, Duane filed a motion to suppress certain statements that he made during proffer sessions that occurred on March 8, 2016; April 27, 2016; and May 3, 2017. The sole issue to resolve in this motion is whether the Government rightfully can invoke paragraph 7 of Duane's proffer agreement. Duane signed the proffer agreement on March 8, 2016 at the first proffer session. (Dkt. No. 78 at 13–15.) In the proffer agreement, co-signed by defense counsel David Cotter, Duane promised "to provide complete and truthful information regarding any and all criminal matters of which the witness may have knowledge." (*Id.* at 13.) Paragraph 7, essentially an enforcement provision, stated in its entirety as follows:

> In the event the witness knowingly provides false or misleading information, or withholds material information, the Government reserves the right to use any statements or tangible objects provided pursuant to this agreement directly against the witness for any purpose deemed proper by the government. If the witness

opposes the direct use of such statements or tangible objects, the witness shall have the burden to move to suppress such statements or objects pursuant to Fed. R. Crim. P. 12. Upon the filing of such motion, the Government shall have the burden of proof by a preponderance of the evidence.

(Dkt. No. 78 at 14.) For purposes of 28 U.S.C. § 636(b)(1)(B) and *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999), the narrative that follows constitutes the Court's findings of fact and assessments of witness credibility.

Duane's first proffer session occurred on March 8, 2016. Present at the session were Duane; Cotter; Frank Pimentel, the lead prosecutor at the time; and FBI Special Agent Eric Sakovics. Also present were FBI Special Agent Robert Kosakowski; FBI analyst Tom Camizzi; and two detectives from the Town of Tonawanda Police Department, Nick Salonikis and Todd Ciehomski. (Dkt. No. 118 at 12.) Cotter described his general approach to advising clients about whether to proceed with proffer sessions:

> I think in general for any client that decision is his or hers. Typically what I say is that this letter—it's two and a half pages long. It's the same in every case. It protects them [*i.e.*, the Government] more than it protects you [*i.e.*, the defendant]. You try to explain—people are nervous at—you know, and—but yes, I try to go through to the best of my ability and explain for them what the ramifications are either of signing it or not signing it.

(Dkt. No. 120 at 13.) Duane decided to proceed. According to Sakovics, "Mr. Loyd had discussed the bank robbery, his role in the bank robbery. And Mr. Loyd also had offered information regarding other armed robberies that had taken place, approximately 15, 16 other robberies that had taken place in addition to the bank robbery that he and his son Brandon had committed." (*Id.* at 13.)

The second proffer session, on April 27, 2016, went in the direction of a cold-case homicide from the 1990s. After the first proffer session ended, Sakovics became aware from a confidential source that Duane might have had something to do with the rape and murder of a Wendy's

restaurant manager in Amherst, New York in 1991. (*Id.* at 19, 20.) To help Amherst Police investigate the new lead, Sakovics set up a second proffer session. Several Amherst Police detectives and FBI agents were present, including Sakovics himself. Pimentel was present. Cotter also was present, and Amherst Police informed Cotter shortly before the session began what the subject matter would be. During the session, Duane mentioned that he once worked at a Wendy's location in Cheektowaga but had never been to the one in Amherst. (*Id.* at 25, 26.) Agents showed Duane a photograph of the murder victim and a photograph of a suspect. Duane stated that he did not know who either person was. (*Id.* at 27, 28; *but see id.* at 64 ("I can't recall if it was 'recognize' or 'do you know.'").) The session ended after about 30 minutes. (*Id.* at 29.)

About a year later, law enforcement agents became interested in conducting one more proffer session with Duane. Agents wanted to add a polygraph to the proffer file, "just to kind of put it [*i.e.*, the investigation of the murder tip] to bed." (*Id.*) Duane agreed to a third session, and the session occurred on May 3, 2017 at the FBI building in downtown Buffalo. (*Id.* at 32.)[1] Cotter was present with Duane when he reviewed and signed paperwork including an advice of rights form. (*Id.* at 32, 108.)

Agents then conducted the polygraph outside of Cotter's presence. (Dkt. No. 118 at 33; *see also* Dkt. No. 120 at 30 ("I [Cotter] subsequently learned that while hooked up to the polygraph he [Duane] was asked about six or seven questions, but that they then continued to interrogate him without me present for two hours or so.").) Prior to the start of the session, Cotter knew generally that the agents wanted to question Duane about a murder. (Dkt. No. 120 at 10.) Not until the questioning began did Cotter learn that the agents wanted to ask Duane specifically about the 1991

---

[1] Cotter testified that the session took place at the U.S. Attorney's Office. (Dkt. No. 120 at 9.) The session most likely took place at the FBI building, but the Court considers this discrepancy insignificant.

murder at the Amherst Wendy's. (*Id.*) During the session, Duane stated that he saw the murder victim at his Wendy's location a few days before the murder, and that he knew that she was attractive. (Dkt. No. 118 at 35.) Sakovics took note of the answer that Duane gave about the murder victim:

> As soon as he [FBI Task Force Officer Robert Cottrell] walked in, I think my exact words to agent—or to TFO Cottrell were you're not going to believe this. And I had explained that—in fact, I asked him a question. I said didn't he just tell us a year ago that he didn't know who she was? To which he confirmed that that was the case. And I said well, he just said he saw her a few days before the murder actually occurred, which was a red flag, or a whatever you want to call it. A light went off pretty quickly.

(*Id.* at 39.) FBI Special Agent James Markovich ran the polygraph device and also recalled Duane's answers during the pre-test portion:

> I asked him was he involved with the murder of the individual at that Wendy's on June 15, 1991. I asked if he knew her, and he—he stated that he did know her. He didn't know her name, but he did know her. He had met her several days before she was murdered. She was the manager—he knew that she was a manager at the Wendy's on Transit, 6940 Transit Road, and she had come over to his Wendy's where he was working in Cheektowaga, and she was serving as a temporary manager and a trainer for several days. He knew that she was well liked by everyone else, and he thought that she was—and he remembered that she was attractive.
>
> ****
>
> I asked him how he found out. He said that he had heard from his manager, an individual named Doug, and he didn't know Doug's last name. But he heard from Doug that she had been murdered. And this is after she had left his Wendy's and went back to work at hers after working at his Wendy's for several days. He had heard that she had died.

(*Id.* at 98–100.) Cotter, however, did not consider Duane's answers to have created a discrepancy:

> Q. So at the time that you learned this from the assistant United States attorney, was that surprising to you then?
>
> A. Was what surprising?
>
> Q. The fact that your client now is saying he did know who she was. He had worked with her. She was attractive.

12

A. No, I didn't find it surprising.

Q. You didn't find that to be different from what he had told you previously?

A. No.  The first—you know, proffer crime scene picture, I don't remember an
awful lot of the face being visible.  Do you know this woman?  No.  And
then I think in the interrogation portion of the lie detector, you know, more
pointed questions, that's how I understood it.

Q. All right.  Do you know—

A. More pointed questions were asked and he gave more thorough answers.  But I
didn't find it surprising.

Q. Do you know that there—during the course of that proffer on May 3rd, 2016,
when this was first brought up, the point was for investigators to see if, in
fact, your client knew anything about this murder?

A. I assume that they were trying to shock him with the graphic nature of the photo
that was shown.

(Dkt. No. 120 at 31–32.)  Duane later was presented with the same photograph of a suspect that he

had seen about a year earlier.  While he turned out to be wrong, Duane this time offered the name

of someone he knew whom he thought looked like the person in the photograph.  (*Id.* at 37.)

Finally, agents noticed that Duane said that he had visited the Wendy's location in Amherst once

before.  (*Id.* at 44.)  Duane claimed that his visit to the Amherst Wendy's occurred when a Niagara

County Sheriff's transport stopped there one day for lunch.  (*Id.*)  Duane was in custody.  (*Id.* at

110.)  Sakovics could not remember whether Duane gave an approximate date for that stop.  (*Id.* at

66.)  Rebecca Smith of the U.S. Marshals Service later testified that Niagara County transports have

a standard practice not to make unscheduled stops, such as stops for lunch.  (*Id.* at 154.)  Smith did

note that unauthorized stops, almost by definition, would not appear in any transport records unless

disclosed voluntarily.  (*Id.* at 157.)

   After the polygraph ended, and during post-test questioning, Markovich informed Duane

that he did not pass the polygraph.  (*Id.* at 102.)  Markovich ended the session and informed Cotter

that Duane failed the polygraph. (*Id.* at 106.) Duane and Cotter must have guessed what subject matter led to the failure, because they subsequently discussed what Duane meant by "knowing" or "not knowing" the murder victim:

> Q. Mr. Cotter, did the defendant ever tell you later that he actually did know the witness or the victim?
>
> A. Never.
>
> Q. He never told you that?
>
> A. He has never—and again, no as in terms of friends, as in terms of acquaintances. What Duane later said was that the woman I believe had been sort of a training manager at his Wendy's in some months before she was killed, but for a relatively short period of time I believe measured in—in two or three days. I think she came into his Wendy's to help train people. But—
>
> Q. When did he tell you that?
>
> A. Offhand I don't recall.
>
> Q. Do you know if it was before or after the polygraph?
>
> A. Recollection would be after.
>
> Q. After the polygraph?
>
> A. Yeah.
>
> Q. So when you went into the polygraph on May 3rd, 2017, with your client, at that point he hadn't told you this information?
>
> A. Not that I recall.

(Dkt. No. 120 at 28–29.)

The parties filed post-briefing on June 11, 2018. Duane focuses his arguments on what he perceives as discrepancies in the accounts of the agents with respect to what photographs were presented at which proffer sessions and when the agents prepared notes or reports after the sessions. Duane also objects to the procedure used for the proffer sessions as beyond the scope of his consent:

Although Mr. Loyd was represented by counsel, his counsel was barred from witnessing the polygraph and interview.

It is on the basis of any feigned conflict between the 302 report and the polygraph interview report that the Government contends that Mr. Loyd breached the proffer agreement and seeks to use his statements in its case in chief.

An informant provided information at some point in time between the May 2, 2016 proffer and the May 3, 2017 polygraph, that Mr. Loyd was the driver of the killer of the Wendy's murder in 1991. He stated it was a robbery and the victim was raped. None of this information is accurate, yet the Government sought a polygraph and interview of Mr. Loyd based on this information.

There is no evidence that Mr. Loyd was the driver—he stated he did not have a driver's license in 1991. He rode a bike at that time.

The Amherst Detective testified that there was no evidence of a rape or robbery during the killing.

It is alleged that Mr. Loyd failed the polygraph, but no evidence was presented that he participated in the Wendy's killing.

Any statements made by Mr. Loyd at the post polygraph interview were a breach of his right to counsel and a violation of his Miranda rights.

Loyd had waived his right to counsel for the express purpose of a polygraph test. His counsel was not permitted into the polygraph room for the pre-test procedure or the actual test. The government went beyond the scope of the agreement it made with Loyd's counsel and subjected Loyd to extensive questioning after the polygraph test had been administrated. Because Loyd was represented by counsel, and had not waived his right to counsel for purposes of post-test questioning, the fruits of such questioning must be suppressed.

(Dkt. No. 134 at 18–19.) The Government responds that it did not need to allow Cotter to attend

the post-polygraph interview:

The government opposes defendant's unpreserved motion to attack the information obtained during the polygraph as a Sixth Amendment violation. First and foremost, defendant made no such motion in his papers. The defense made it clear that they were only proceeding on the issue of whether the defendant knowingly provided false information to the government (*See*, defense letter dated Dec. 11, 2017).

Even if the issue was preserved, there is no basis to grant suppression on this basis. The defendant executed an Advice of Rights document (FBI Form FD-395) which clearly states that he has the right to have his attorney present during

questioning (Gov't Ex. 4). The defendant signed a waiver on that form which reads that he is "willing to answer questions without a lawyer present." The document was signed by the defendant and his attorney. The defendant was also advised of his right to refuse to participate in certain questioning. (Gov't Ex. 5). The defendant executed both documents in the presence of his attorney.

*****

Here, the defendant agreed to be interviewed outside the presence of his attorney. And, his attorney also agreed to this arrangement. It should be noted that this was not the defendant's first polygraph examination in a federal investigation. (March 1 Tr., p. 89: 21-23).

Furthermore, to the extent that defendant cites to a post-polygraph interrogation that was in violation of the Sixth Amendment, that argument is belied by the record. The witness who administered the examination testified that the polygraph is made up of three parts: the pre-test, the test, and the post-test. All three parts are within the standard polygraph examination. (March 1 Tr., p. 115: 15-19).

(Dkt. No. 135 at 13–14.) As for alleged procedural problems or discrepancies about photographs, the Government argues that what really matters is how Duane changed his story between the second and third proffer sessions:

Even assuming, *arguendo*, that the defendant was only shown a crime scene photo of the victim, he still lied and misled investigators in that meeting. The defendant told SA Markovics that he knew about the murder because his manager (whose name—"Doug"—he still remembers 26 years later) informed him of the murder at Wendy's immediately after it happened. (March 1 Tr., p. 100: 2-11). This would have been a memorable event given the fact that the victim was working as the defendant's temporary manager only days earlier and that he found her attractive. (March 1 Tr., p. 99: 1-6; p. 100: 19-20). So even if the Amherst police showed up with no photo of the victim for the proffer on May 2, 2016, the defendant misled and lied to the government when he said that he knew nothing about the incident.

The invented dispute over which photo of the victim was shown to the defendant is nothing more than a red herring designed to divert the attention away from the unmistakable reality in this case: the defendant knows her, the defendant knows about her murder, and the defendant intentionally withheld that from the government when he was duty-bound to be truthful.

The defendant also misled investigators when he stated that he didn't recognize the suspect depicted in government Exhibit 17. He further misled investigators when he stated that he had never been to that Wendy's location before. Even if you believe his claim that he simply forgotten about stopping at that

location—the details of his changed answer are incredible. He submits that the circumstances about how he stopped at Wendy's was a transport ride with New York State corrections officers on May 7, 2013 (Def's Ex. 1). The testimony of Deputy United States Marshal Rebecca Smith refutes that prisoner transports regularly include stop offs at fast food restaurants. Defendant has provided no evidence to support his incredible claim that he stopped at the crime scene in 2013. And even if it were true, why would the defendant not remember this visit when he is questioned about it in 2016—only three years later? I submit that the only reason the defendant is so persistent in this claim is because he recognized that he would fail this portion of the polygraph on May 2, 2017 and he needed to come up with a plausible story about visiting the crime scene.

(*Id.* at 11–12.)

After hearing the testimony and considering the parties' arguments, the Court agrees with the Government that Duane's arguments about his Fifth Amendment and Sixth Amendment rights are unavailing. Simply put, Cotter is an experienced defense attorney who gave Duane sound general advice about how proffers and polygraphs proceed. Cotter testified that he explained to Duane the advantages and disadvantages of proceeding with the proffer sessions. Duane made the choice to proceed. Even if Duane somehow did not know that the third proffer session would break down into pre-polygraph, polygraph, and post-polygraph portions, Duane by that point received enough advice from Cotter and from the agents that he could have stopped the session at any time.

Instead, the Court agrees with the Government that the only real issue to adjudicate in Duane's suppression motion is what to do about the discrepancies in Duane's testimony. The Court finds that the Government met its burden, by a preponderance of the evidence, of showing discrepancies in Duane's testimony. Even if some confusion existed over exactly which photographs the agents showed between in the second and third proffer sessions, the Court concludes that the agents showed Duane photographs during the second proffer session that would have allowed him to recognize a woman who conducted training at his place of employment and

whom he considered attractive. In reaching this conclusion, the Court is not particularly interested in delineating what "know" means; the Court is willing to credit Duane to the extent that there are limits to how well he could have "known" an attractive woman who showed up at his workplace for a few days of training. What matters here is that Duane could have told the agents at the second proffer session that he had encountered the murder victim before, and how he had done so. He chose not to disclose the information. That choice made Duane less than truthful. The Court concludes further that Duane was less than truthful about his familiarity with the Amherst Wendy's location. The Court agrees with the Government that Duane's story about Niagara County Sheriffs pulling a transport van into a Wendy's for lunch is sufficiently implausible that it was a cover story for his familiarity with the Amherst Wendy's location.

With the Court having determined that Duane was evasive about recognizing the murder victim and about visiting the Amherst Wendy's location, it now has to consider the legal consequences of Duane's conduct. "Pre-trial agreements, such as cooperation agreements and proffer agreements, are interpreted according to principles of contract law. A contract must be interpreted to give effect to the intent of the parties. Where the language of a contract is unambiguous, the parties' intent is discerned from the four corners of the contract." *United States v. Liranzo*, 944 F.2d 73, 77 (2d Cir. 1991) (internal quotation marks and citations omitted). Here, the proffer agreement that Duane signed stated unambiguously that his proffer statements were fair game at trial if he "knowingly provides false or misleading information, or withholds material information." As the Court concluded above, that is what Duane did. The language of the proffer agreement, on its face, gives Duane no leeway to argue about the degree or severity of any breach related to truthfulness. *Cf., e.g., United States v. Adams*, 655 Fed. App'x 312, 318 (6th Cir. 2016) (unpublished decision) (breach of a proffer agreement for failure to disclose knowledge of criminal

matters beyond those charged); *United States v. Johnson*, 174 Fed. App'x 511, 513 (11th Cir. 2006) (unpublished decision) (breach of a plea agreement where the defendant "had minimized the amount of drugs dealt because of his personal relationship with that individual"); *United States v. Crawford*, 86 Fed. App'x 834, 840 (6th Cir. 2004) (unpublished decision) (breach of a plea agreement where "Crawford admitted in his proffer to owning four of the five weapons recovered; however, when cross-examined by the Government at his sentencing, Crawford admitted only to owning the Ruger rifle."); *United States v. Beasley*, No. 12-20030, 2014 WL 2095357, at *8 (E.D. Mich. May 20, 2014) (breach of a proffer agreement where "Stewart did not simply minimize his own actions and criminal responsibility. He also shielded the criminal activities of his close friend Bandemer, as well as the criminal activities of Shumake and Co–Defendants Zajac and Beasley."); *United States v. Nesbitt*, No. 2:08-CR-1153-DCN, 2010 WL 3701337, at *6 (D.S.C. Sept. 14, 2010) ("Defendant's statement in his proffer that no one knew of his plan to stage his own death and flee except for Max Reed was clearly a material misstatement."). Duane thus has given the Government the opportunity to use any of his proffer statements against him at trial. The only room for argument that Duane might have left concerns the interaction between paragraph 7 of the proffer agreement and other rules in the Federal Rules of Evidence. Though the proffer agreement does not identify the rule by number, it aims primarily at FRE 410. The language about the Government having the right to "use" statements for any purpose that it deems proper does not necessarily mean that it can usurp the Court's role in deciding whether to admit evidence in accordance with other rules. *See, e.g., United States v. Barrow*, 400 F.3d 109, 119 (2d Cir. 2005) ("We further note that even when a district court is satisfied that a factual assertion triggering a Rule 410 waiver has been made, whether directly or implicitly, that conclusion does not mandate receipt of the proffer statements in evidence. A waiver agreement between the parties does not divest a district court of its considerable discretion to

exclude relevant evidence that may inject 'unfair prejudice' or 'confusion' into the jury's resolution of the issues in dispute.") (citing FRE 403; other citation omitted); *In re 650 Fifth Ave. & Related Properties*, No. 08 CIV. 10934 (KBF), 2017 WL 6398617, at *1 (S.D.N.Y. May 30, 2017) (soliciting Government briefing as to how certain statements otherwise admissible under a proffer agreement would "not run afoul of other rules of evidence"). Judge Arcara will be in a better position to address the admissibility of particular proffer statements, apart from FRE 410, as the trial unfolds.

For the above reasons, the Court respectfully recommends denying Duane's motion to suppress.

### C. Motion to dismiss (Dkt. No. 79) (dispositive)

During proceedings on September 28, 2017, the Court gave Duane's then-counsel Cotter the option to file a certain motion that Duane himself drafted and felt strongly about filing. (Dkt. No. 77.) Cotter went ahead and filed the motion on September 29, 2017. In the motion, Duane invokes the Sixth Amendment when writing, "Unless and until the United States has filed and published acceptance of jurisdiction it is to be conclusively presumed that no such jurisdiction has been accepted." (Dkt. No. 79 at 5.) Duane then raises the issue of subject-matter jurisdiction by writing, "The A.U.S.A. Mike Felicetta has not only failed to provide the essential element subject-matter jurisdiction [sic], but also by its omission, his failed to charge an 'offense against the laws of the United States.'" (*Id.* at 5.) After invoking jurisdiction, however, Duane emphasizes that he "is not challenging whether this Court has jurisdiction to punish these felonious crimes, but only respectfully that the government provide defendant with the following documentation . . . showing ownership by the United States (Federal Government), over the exact geographical location(s) wherein the charging documentation alleges the criminal activity occurred . . . ." (*Id.* at 6.)

For the sake of the completeness of the record, the Court will allow the motion and the Government's response (Dkt. No. 81) to remain in the record. The Court will not otherwise spend a lot of time on this motion. The indictment properly put Duane on notice that the Government was accusing him of a crime in this District involving the United States monetary and banking systems, as well as a weapon affecting interstate commerce. *See* Fed. R. Crim. P. 7(c)(1). Duane has not pointed to any other element of the statutes in question that does not appear in the indictment. *See, e.g., United States v. Frias*, 521 F.3d 229, 235–36 (2d Cir. 2008) ("The indictment plainly tracks the language of the statute and states the time and place of the alleged [crime]. It was therefore sufficient to invoke the district court's jurisdiction and to state an offense."). At arraignment on February 10, 2016, Duane answered affirmatively that he understood the nature of the accusation against him. *Cf. e.g., United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001). Under these circumstances, the Court finds no defects in the indictment. The Court accordingly recommends denying Duane's motion.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying Duane's dispositive motions. (Dkt. Nos. 78, 79.) The Court adjudicates Duane's non-dispositive motions as described above.

## V.    OBJECTIONS

For Duane's dispositive motions, a copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." FRCP 59; *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

___/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: July 3, 2018

22