UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

─────────────────────────────────

UNITED STATES OF AMERICA,

                Plaintiff,

     v.                            **DECISION AND ORDER**
                                        16-CR-13-RJA

DUANE LOYD,

                Defendant.

─────────────────────────────────

Defendant Duane Loyd has filed a *pro se* motion (Dkt. No. 258) for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i). The Government filed a response in opposition (Dkt. Nos. 262, 265), and Defendant submitted reply papers (Dkt. No. 266). For the following reasons, Defendant's motion for a sentence reduction under the compassionate release statute is DENIED.

## BACKGROUND

Defendant was charged in a five-count Indictment (Dkt. No. 14), returned February 2, 2016, with bank robbery by use of a dangerous weapon, in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2 (Count 1); entering a bank with intent to commit a larceny, in violation of 18 U.S.C. §§ 2113(a), 2113(d), and 2 (Count 2); bank larceny, in violation of 18 U.S.C. §§ 2113(b), 2113(d), and 2 (Count 3); brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Count 4); and felon in possession of a firearm, in violation

of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2 (Count 5).  On October 2, 2018, Defendant entered guilty pleas to Counts 1 and 4.  The counts charged in the Indictment pertained to the robbery of a bank and use of a firearm to aid the commission of that crime, on December 7, 2015.  In the plea agreement (Dkt. No. 144), however, the parties agreed that Defendant's sentencing range for imprisonment would be determined as if he was also convicted of sixteen violations of 18 U.S.C. § 1951 (Hobbs Act robbery), with respect to sixteen robberies Defendant committed with his son, co-defendant Brandon Loyd, between approximately November 22, 2015, and December 6, 2015.

On January 25, 2019, the Court sentenced Defendant to 130 months on Count 1 and 84 months on Count 4, to run consecutively to Count 1, for an aggregate term of imprisonment of 214 months, along with an aggregate of 4 years of supervised release.  Count 4 carried a mandatory minimum of 7 years (84 months), to run consecutive to any other term of imprisonment.  With a Criminal History Category VI and a total offense level 27, Defendant's Guidelines range on Count 1 was 130 to 162 months.  His aggregate range was 214 to 246 months.  Thus, the Court sentenced Defendant to the low-end of the Guidelines range, a recommended sentence the Government did not oppose.

Defendant, who is 53 years old, is currently housed at Federal Correctional Institution, Otisville, New York ("FCI Otisville"), with a projected release date of March 29, 2031.[1]  In his motion, Defendant asks that the Court reduce his sentence

---

[1] *Inmate Locator: Register Number 25251-055*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Apr. 15, 2025).

to time served, immediately release him, and permit him to serve the remainder of his sentence on home confinement as a condition of his supervised release.

## DISCUSSION

Section 3582(c)(1)(A), commonly known as the compassionate release statute, provides an exception to the general rule against a federal district court's modification of a sentence after it has been imposed.  Under the statute, a court may reduce a defendant's term of imprisonment only when four requirements are satisfied.  *See United States v. Garcia*, 09-cr-330 (KAM), 2024 U.S. Dist. LEXIS 219759, *3 (E.D.N.Y. Dec. 4, 2024).

First, "absent waiver of forfeiture by the government," the defendant must have "fully exhausted all administrative" remedies or waited for "the lapse of 30 days from the receipt of such request by the warden of the defendant's facility" before moving for compassionate release.  *United States v. Keitt*, 21 F.4th 67, 73 (2d Cir. 2021) (per curiam); 18 U.S.C. § 3582(c)(1)(A).  Next, the defendant must demonstrate that "extraordinary and compelling reasons warrant" a sentence reduction.  18 U.S.C. § 3582(c)(1)(A)(i).  The district court must also consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable."  18 U.S.C. § 3582(c)(1)(A).  Finally, the court must find that a reduction is consistent with United States Sentencing Guidelines § 1B1.13, which sets forth the Sentencing Commission's Policy Statement regarding a sentence reduction under § 3582(c)(1)(A) and outlines various circumstances that rise to the level of extraordinary and compelling reasons.  "In addition to guiding courts in determining whether extraordinary and compelling reasons warrant a sentence reduction, §

3

1B1.13 also provides that a court should reduce a defendant's sentence only after

determining that 'the defendant is not a danger to the safety of any other person or

to the community,' *id.* § 1B1.13(a)(2)."  *Garcia*, 2024 U.S. Dist. LEXIS 219759, at *5.

It is a defendant's burden to show that he or she is entitled to a sentence

reduction.  *See United States v. Jones*, 17 F.4th 371, 375 (2d Cir. 2021) (per

curiam).  "A district court has broad discretion when considering a motion for

compassionate release."  *United States v. Halvon*, 26 F.4th 566, 569 (2d Cir. 2022)

(per curiam).

Before proceeding with its analysis, the Court is first compelled to address a

glaring error in the Government's response to Defendant's motion.  The

Government's argument begins:

> The Court should deny the defendant's motion for
> compassionate release for several reasons.  First, there is no
> change in law with regard to murder as a crime of violence.
> Second, as it relates to Hobbs Act robbery as a crime of
> violence, Section 3582(c)(1)(A)(i) does not authorize sentence
> reductions based on changes in law, either alone or in
> combination with other factors.  Therefore, there is no
> extraordinary or compelling reason to release the defendant.
> Finally, the defendant is a danger to the community and analysis
> of the sentencing factors pursuant to 18 U.S.C. § 3553(a)
> requires the defendant to complete his 330-month sentence.

Dkt. No. 262, pp. 4-5.

The Court presumes the foregoing excerpt was intended for the Government's

response to another defendant's compassionate release motion, considering

Defendant was not convicted of murder, makes no arguments concerning changes

in the law, and was not sentenced to 330 months in Federal Bureau of Prisons

("BOP") custody.  The Court cautions the Government to expend greater care in

4

formulating its responses to defendants' motions for compassionate release and in reviewing those responses before filing them with the Court.

## I.    Exhaustion of Administrative Remedies

The Government argues Defendant did not make any assertion pertaining to exhaustion or provide "any documentation" to the Court regarding an administrative request made to the BOP for compassionate release. To the contrary, Defendant's initial motion papers, dated December 23, 2024, include a copy of an email request to the warden at the BOP facility where is he housed, dated November 23, 2024, asking for compassionate release based on (a) his declining health, (b) having an elderly mother with dementia, and (c) his rehabilitation. Dkt. No. 258, p. 7. Defendant also argued, "I have exhausted all available administrative remedies for this matter." Dkt. No. 258, p. 5. In his reply papers, Defendant notes that as of March 8, 2025, he had still not received a response from the Warden regarding his request. Thus, the Court will consider Defendant's motion on the merits.

## II.    Extraordinary and Compelling Circumstances

A defendant "must demonstrate that his proffered circumstances are indeed 'extraordinary and compelling' such that…a sentence reduction…would not simply constitute second-guessing of the sentence previously imposed." *Keitt*, 21 F.4th at 71; 18 U.S.C. § 3582(c)(1)(A)(i).

Defendant argues his family circumstances warrant a sentence reduction because his elderly mother has dementia. Guideline § 1B1.13(b)(3)(C) provides that the "incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent" is a circumstance presenting an extraordinary and

compelling reason for compassionate release. Defendant has not met his burden of demonstrating that (a) his mother is incapacitated, and (b) Defendant is the only available caregiver for his mother. *See*, *e.g.*, *United States v. Romano*, 707 F. Supp. 3d 233, 237-38 (E.D.N.Y. 2023). Defendant simply states his mother "is in a stage of not being able to care for herself and will shortly be incapacitated."

Defendant primarily argues, however, that his slew of medical conditions, in combination with his conditions of confinement, constitute an extraordinary and compelling reason for a sentence reduction. The relevant provisions of Guideline § 1B1.13 require the Court to assess Defendant's physical health and the extent to which any condition "substantially diminishes" his ability to "provide self-care" within a correctional facility and whether he is expected to recover from said condition, § 1B1.13(b)(1)(B); and whether "long-term or specialized medical care" is required that is not being provided to Defendant and the consequences of failing to receive that care, § 1B1.13(b)(1)(C).

Exhibit 1 to the Government's opposition papers is approximately 240 pages of Defendant's BOP medical records from FCI Otisville (Dkt. No. 265, pp. 1-239), spanning 2024 through January 14, 2025. To be sure, Defendant does suffer from several chronic health conditions, to include Type 2 diabetes mellitus with diabetic neuropathy; retinopathy; hyperlipidemia; hypertension; peripheral vascular disease; asthma; anemia; and chronic kidney disease, stage 3 (moderate).[2] As far as the

---

[2] *See* Dkt. No. 265, pp. 114-17 (list of current health problems). Defendant also argues he was recently diagnosed with Crohn's Disease, but there is no such diagnosis in the records provided by the Government. Before January 14, 2025, which is when the records end, Defendant was being evaluated for a possible neuroendocrine disorder or

Court can tell from this record, however, Defendant's medical conditions have been adequately treated and monitored in the BOP. He has been prescribed medication for his health issues,[3] and provided medical devices and equipment.[4] In addition to clinical encounters in the BOP, Defendant has received medical treatment from specialists outside the BOP, such as a podiatrist and a gastroenterologist.[5] Presumably relative to his peripheral vascular disease,[6] on January 14, 2025, the BOP entered a consultation request for vascular surgery targeted for May 2025, due to, among other symptoms, Defendant's chronic leg cramps.[7]

In addition to the above-referenced chronic conditions, in 2017 or 2018, Defendant had two eye surgeries to remove cataracts,[8] and in 2021, he had

---

Crohn's Disease due to gastrointestinal issues he was experiencing. *See* Dkt. No. 265, pp. 224, 230.

[3] *See* Dkt. No. 265, pp. 128-33 (list of active prescriptions).

[4] *See* Dkt. No. 265, p. 105 (list of devices and equipment).

[5] *See*, *e.g.*, Dkt. No. 265, pp. 52, 63, 198-99, 204-07, 226-29.

[6] "Peripheral vascular disease (PVD) is a slow and progressive disorder of the blood vessels…Organs supplied by [certain blood] vessels, such as the brain or legs, may not get enough blood flow for healthy function. The legs and feet are most often affected…Those who smoke or have diabetes have the highest risk of complications from PVD. This is because these risk factors cause impaired blood flow…Treatment may include…[v]ascular surgery." *Conditions and Diseases: Peripheral Vascular Disease*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/peripheral-vascular-disease (last visited Apr. 15, 2025).

[7] *See* Dkt. No. 265, p. 5.

[8] *See* Dkt. No. 265, p. 68 (optometry exam notes stating Defendant described a "2017 cataract removal with implants"); *see also* Dkt. No. 171 (PSR), ¶ 228 (Defendant "advised he [had] been diagnosed with cataracts and had them removed through two (2) surgeries" in 2018).

amputation(s) performed on his left big toe.[9]  Defendant argues that his eye surgeries and toe amputation, the latter which he claims was precipitated by an untreated infection, were "due to the negligence of the BOP's Health Services and care."  There is nothing in this record to support this bald allegation, and Defendant's eye surgeries occurred before he was sentenced and entered BOP custody.

Defendant further argues that after he emailed his compassionate release request to the Warden in late November 2024, FCI Otisville experienced an active and uncontrollable COVID-19 outbreak that resulted in a high number of positive inmates and two deaths.  Defendant argues the "threat of infection and death is especially imminent" for him, as he is a high-risk inmate due to his preexisting medical conditions.

"As an initial matter, COVID-19 is no longer considered a federal ongoing public health emergency."  *United States v. Jimenez Cruz*, 19-CR-326 (KMW), 2024 U.S. Dist. LEXIS 152680, *4-5 (S.D.N.Y. Aug. 26, 2024), citing *COVID-19 Public Health Emergency*, U.S. Dep't Health & Human Servs. (last reviewed Dec. 15, 2023), https://www.hhs.gov/coronavirus/covid-19-public-health-emergency/index.html ("The federal Public Health Emergency for COVID-19 expired

---

[9] *See* Dkt. No. 265, pp. 118 (listed "[r]esolved" health issue of "osteomyelitis, unspecified," also noting "[l]eft great toe – s/p partial amputation 5/2021"), 198 (outside orthopedic clinic noting Defendant's "history of amputation due to osteomyelitis in his left big toe"); *see also Diseases & Conditions: Osteomyelitis (Bone Infection)*, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/osteomyelitis-bone-infection ("Osteomyelitis is a serious infection that happens when bacteria or fungi infect your bone marrow.  Infections usually start on your skin at a wound or surgery site then spread to your bones through your bloodstream.  It can cause permanent bone damage if it's not treated right away.") (last visited Apr. 15, 2025).

on May 11, 2023.").  Indeed, "the ubiquitous availability of the COVID-19 vaccination and treatment options for those who do become infected, has eliminated COVID-19 as a basis for granting compassionate release; even for those persons whom the CDC has in the past said were at risk of suffering a severe outcome if they were to become infected—a category into which [Defendant] might arguably fall."  *United States v. Douglas*, 04-CR-1065 (CM), 2024 U.S. Dist. LEXIS 117215, *7 (S.D.N.Y. July 2, 2024).

Defendant also does not provide any proof of a recent outbreak at FCI Otisville,[10] and his medical records reveal he had a COVID-19 infection in 2020 and recovered from it, and he was vaccinated for COVID-19 as recent as October 2024.[11]  As to Defendant's related argument that the severity of his sentence was greater than originally anticipated by the Court when it sentenced him in 2019, due to worsened prison conditions during the pandemic, the Court appreciates that the pandemic caused hardship for inmates and certainly takes into consideration the harsher-than-typical conditions of confinement for defendants who served sentences during that period.

---

[10] The only documentation Defendant includes regarding a facility shutdown is an Inmate Bulletin dated February 10, 2025 (Dkt. No. 266, p. 11), which states that FCI Otisville was "locked down due to numerous incidents of recovered illicit substances and homemade weapons."

[11] *See* Dkt. No. 265, p. 119 (a "[c]onfirmed case [of] COVID-19" on list of "[r]esolved" health problems), p. 125 (list of immunizations), p. 191 (COVID-19 vaccination consent form, in which Defendant indicates he had previously received the vaccine and consents to another vaccination).

Defendant also contends that his rehabilitation while in BOP custody constitutes an extraordinary and compelling reason for a reduction in his sentence. He has established his efforts at rehabilitation through completion of numerous educational programs,[12] including a drug abuse education course, and having served as a mentor to other inmates (*see* Dkt. No. 258, pp. 8-25 [course certificates and other documentation]). Even so, rehabilitation is "not, by itself, an extraordinary and compelling reason" for a sentence reduction. Guideline § 1B1.13(d), citing 28 U.S.C. § 994(t). Although commendable, "a productive institutional record while incarcerated ... is what is expected[.]" *United States v. Baptiste*, 15-CR-854 (SHS), 2024 U.S. Dist. LEXIS 124854, *5 (S.D.N.Y. July 16, 2024) (internal quotation marks and citation omitted).

The Court hereby finds that Defendant has not presented extraordinary and compelling reasons for compassionate release. Defendant's demonstrated rehabilitation attempts along with the harsher sentence he served because of the COVID-19 pandemic do not counsel in favor of early release.

III.    **18 U.S.C. § 3553(a) Factors**

Even if Defendant could demonstrate that an extraordinary and compelling reason for a sentence reduction exists, the Court would nonetheless conclude that compassionate release is not warranted upon its consideration of the factors under

---

[12] Defendant argues that he has taken "over (45) other courses [in addition to the drug abuse prevention program] while being in the FBOP since 2019." Defendant has provided copies of only nine, non-duplicative certificates from programming he has completed in the BOP. Dkt. No. 265, pp. 10-11, 13-17, 24-25. The Court has no reason to doubt, however, Defendant's claim about the extent of his programming, as the Government does not dispute it.

18 U.S.C. § 3553(a).  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as "the need for the sentence imposed…to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; and the need "to protect the public from further crimes of the defendant," and "to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(C), (a)(6).

The severity of Defendant's offense conduct remains unchanged.  On December 7, 2015, Defendant's son entered a bank, placed a mask over his face, approached the tellers, and demanded cash.  He displayed a firearm and robbed the tellers of almost $10,600.00.  His son then exited the bank and entered a vehicle driven by Defendant.  A police chase ensued, and the police cruiser and Defendant's vehicle ended up colliding.  Defendant and his son attempted to flee on foot, but they were arrested.  In addition, Defendant's range of imprisonment was determined as if he was also convicted of sixteen Hobbs Act robberies, which he and his son orchestrated, at various gas stations and convenience stores in an approximate two-week timespan.  Defendant's son entered the businesses and possessed a gun or gestured as though he had one during most of the robberies, and Defendant was the getaway driver for each robbery.  Victims could have been seriously injured because of Defendant's and his son's conduct.

At sentencing, the Court stated that it had compared the PSRs of Defendant and his son, and commented on the "significant[ ] differen[ce]" between Defendant's

criminal history and his son's, with Defendant's Criminal History Category at a VI and his son's at a II, and Defendant having 35 more arrests and six more felony convictions than his son. That difference, among other "big" differences between Defendant and his son, factored into the Court imposing a sentence for Defendant at the low-end of the Guidelines range, that is, 214 months. *See* Dkt. No. 182 (Sentencing Tr.), pp. 14-15, 21. The Court also previously denied Defendant's son's motions for compassionate release, filed during the pandemic. *See* Dkt. Nos. 209, 220, 222 (text orders). Reducing Defendant's sentence would create an unwarranted disparity between his 214-month sentence and his son's 85-month sentence. In addition, as of February 4, 2025, Defendant had served 9 years, 1 month, and 29 days in BOP custody, or only approximately 51% of his sentence. *See* Dkt. No. 265, p. 243 (Gov't Ex. 2).

Defendant argues he is not a danger to the community because he has a "non-violent" criminal history and no prior convictions for any firearms offense, and because his motive to commit the crime was financial desperation. Regardless of these assertions, Defendant's criminal history is abysmal. In addition to what the Court noted at sentencing, Defendant's criminal record began at the age of 15, and his felony convictions include robbery, grand larceny, forgery, and criminal possession of a weapon.[13] Defendant previously served incarceration sentences— the greatest being 42 months to 7 years' imprisonment—to no avail in deterring his

---

[13] Dkt. No. 171 (PSR), ¶¶ 171, 173, 181, 182. Defendant's conviction for criminal possession of a weapon involved a "gravity folding knife" located in Defendant's back pants pocket when he stole a Playstation game console from a Target store. Dkt. No. 171 (PSR), ¶ 181.

criminal activity. The Court's imposition of a 214-month sentence was required to adequately deter Defendant from further criminal conduct.

The Court easily concludes that no reduction in sentence is warranted, and Defendant shall serve the balance of his sentence to achieve the purposes of his sentencing. Defendant's expressed desire to return to a drug treatment program and undergo counseling, and his continued family support, should both aid Defendant in his return to society upon his release.

## CONCLUSION

As set forth above, because Defendant has not shown extraordinary and compelling circumstances and because any sentence reduction would be inconsistent with the factors set forth in 18 U.S.C. § 3553(a), Defendant's motion for compassionate release (Dkt. No. 258) under 18 U.S.C. § 3582(c)(1)(A) is DENIED.

**IT IS SO ORDERED.**

_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated: April 15, 2025
        Buffalo, New York